[Civ. No. 2224. Fourth Appellate District.—March 7, 1939.]

RICHARD O'ROURKE et al., Appellants, v. DAY AND NIGHT WATER HEATER COMPANY, LTD. (a Corporation), Respondent.

John G. Covert and Norman H. Elkington for Appellants.

W. M. Conley, Philip Conley, Matthew Conley, Conley, Conley & Conley and Sidney J. W. Sharp for Respondent.

BARNARD, P. J.—This is an action for damages on account of injuries sustained by the plaintiffs through an explosion of butane gas, which occurred in the basement of the O'Rourke home on April 21, 1936. This explosion occurred as Richard O'Rourke, in the act of relighting the pilot light on a water heater, put a lighted match through the heater door.

The water heater in question was manufactured by the defendant, and sold to a wholesale dealer who sold it to a retailer, from whom it was purchased by O'Rourke in December, 1935. This water heater was equipped with a thermostatic device which would automatically turn on the main gas burner whenever the water in the heater fell below a certain temperature. It was also equipped with a "safety pilot" manufactured by another company and furnished to the defendant at the rate of about 2,000 per month. This safety pilot was a patented device, the function of which was to shut off the supply of gas whenever the pilot light was extinguished as, otherwise, the action of the thermostatic device would turn on a full flow of gas when the water in the heater had cooled.

This safety pilot consists of a brass casting, to which are attached two tubes, some eight or nine inches long, which extend into the heater to a point near the burner. The lower of these tubes conveys a small amount of gas which runs the pilot light at the end of that tube. Immediately above that tube is a larger tube, the end of which is directly in the flame of the pilot light. In the upper tube is a copper rod, the expansion and contraction of which causes the safety valve to operate. There are some twenty parts in the valve itself, including a spring, a snap diaphram, a needle valve and a

plunger. All of these parts are sealed inside the brass casting. The valve itself must be adjusted to ¾ths of 1/1000th of an inch. In other words, the valve will open or close admitting or shutting off the gas when the expansion or contraction of the copper rod causes a movement on the plunger of ¾ths of 1/1000th of an inch.

In this action, based upon the negligence of the defendant in manufacturing the water heater, the jury found for the plaintiffs and the court granted a motion for a judgment notwithstanding the verdict. From the judgment so entered this appeal was taken.

While the evidence is conflicting in that regard we think it is sufficient to sustain the implied finding that the presence of a large quantity of gas, which led to this explosion, was caused by the failure of this safety pilot to function properly, thereby permitting the gas to flow when the pilot light became extinguished. However, no question of warranty is here involved and the appellants base their entire case on the rules laid down in *MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382 [111 N. E. 1050, Ann. Cas. 1916C, 440, L. R. A. 1916F, 696], and approved in *Kalash* v. *Los Angeles Ladder Co.*, 1 Cal. (2d) 229 [34 Pac. (2d) 481], and *Dahms* v. *General Elevator Co.*, 214 Cal. 733 [7 Pac. (2d) 1013], to the effect that the manufacturer of an article, knowing that it is to be used by others than the immediate purchaser, is liable for injury to such others which is directly traceable to negligence on the part of the manufacturer if the nature of the article is such that it is reasonably certain to place life and limb in peril when negligently made, and that such a manufacturer is not absolved from the duty of inspection because it bought one of the component parts from another manufacturer, but owes a duty to subject all parts so purchased from another to ordinary and simple tests, and is guilty of negligence if it fails to make such tests. The only negligence ascribed by the appellants to the respondent is in failing to comply with the above rule by sufficiently testing these safety pilots which were obtained from another manufacturer. It is claimed that this respondent "by making simple tests, could have determined that each valve placed by it on a water heater was in a good condition and properly adjusted", and that the evidence fails to show that this was done.

In support of this proposition the appellants point to the following evidence. A representative of the respondent testified that he knew of the explosive nature of the gas to be used in these heaters and of the great danger that would follow if a defective safety pilot was placed on a water heater; that they did not have in their factory any man whose duty it is or who was qualified to examine the interior of these safety pilots; that these safety pilots are very complicated devices; that they are received in the stock room where a clerk looks them over on the outside to see that they appear to be in good shape; that if they are "broken off or bent out of shape" he would probably find it; that the devices are then given an external inspection in the assembling department; that they would have no way of telling whether the steel in the spring of the device had become crystallized; that other than by a "fire test", that is testing it as in actual operation, they had no way of determining whether the spring was broken or the device out of adjustment; and that in giving them this test they find some, probably two or three out of a thousand, which are improperly adjusted and which are sent back to the manufacturer of the device. A representative of the latter company testified that the coil spring in the device is a very important part thereof; that his company purchased these springs from another manufacturer and tested each shipment by inspecting and testing probably ten or fifteen springs out of each thousand; that after the safety pilot is assembled in their plant it is given two fire tests and if it works it is sent out to the respondent, and other manufacturers of water heaters; and that it is a delicate operation to adjust the device so that it will work.

In addition to the above the respondent points to the following evidence. A manager of the company which manufactures the safety pilots testified that these devices, manufactured by his company, are used on approximately 70 per cent of the water heaters of this type manufactured in the United States; that they tested each shipment of springs as they came in, picking ten or fifteen out of each thousand and breaking the spring down, testing its tensile strength and the correct weight; that each spring, as it was put into the device, was also tested by hand; that there is an inspection of each part of the device as it is made, there being gauges on every machine making the parts; that after making a general in-

spection of each part that goes into the safety pilot the assembled device is twice subjected to a fire test to see if it works; that before making the fire tests the moving parts are tested to see that the valve assembly is timed correctly with the snap diaphram; that another person tests the adjustment of the copper bar, the expansion and contraction of which causes the valve assembly to work; that once set the device is not apt to get out of alignment unless it is damaged in some way, or has been tampered with; that the valves are set so that when the copper expands approximately $1/10,000$th of an inch it opens and when it contracts about $1/5000$th of an inch it closes; that the devices are inspected before they leave the plant to make sure they are good; and that after a final checking they are placed in clean paper sacks and packed in cardboard boxes with strips to separate the valves from each other, as in an egg crate. A representative of the respondent testified that after the safety pilots are installed in the heaters they are given two separate fire tests to see that they are working properly; that he knew of no other test that he could give them; and that dropping the devices or mishandling them would get them out of order. Another representative of the respondent testified that these safety pilots are never intrusted to a public carrier but are "carried on our own trucks". There is also evidence that the manufacturer of the safety pilot device seals all of the working parts thereof in the brass casting with a special material in order to make it gas tight.

Under the rules above referred to, in the exercise of reasonable care, a duty rested upon the respondent as the manufacturer of these heaters to subject the parts purchased from other manufacturers to ordinary and simple tests, at least, of their fitness for their intended use. The respondent inspected these devices in so far as this could be done externally and twice subjected them to a "fire test" similar in all respects to the conditions to be met in actual operation, in order to see that they worked. The appellants do not claim that any further external test was either reasonable or possible, and they even allege in their complaint that "the negligent and careless construction" of the safety pilot "was not observable in the exercise of ordinary or reasonable care". The real question here presented is whether the respondent, by making these external inspections and tests, fulfilled the duty

resting upon it, or whether a compliance with the rules of care required it to also make an internal inspection with further tests of the working parts.

Liability is imposed by the rules in question where the defective condition of the part used could have been discovered by reasonable inspection and tests and where these have been omitted. The reasonableness of the inspection and tests used must depend upon the circumstances of the particular case. Ordinary and simple tests may well disclose defects in pieces of wood to be used as rungs in ladders or spokes in wheels. Assuming that more complicated tests, necessary to disclose the condition of parts made of iron, steel or other metal, might be held requisite in some cases, in the exercise of ordinary care, we have here a further and different condition since this device consists of a complicated, delicately adjusted mechanism which came sealed in a casting and the usefulness of which would certainly be destroyed if it were opened.

Not only does the care required of a manufacturer who uses parts made by others vary with the danger to be expected, but the kind of inspection called for must "vary with the nature of the thing to be inspected". (*MacPherson* v. *Buick Motor Co., supra.*) If the respondent was required to make an internal inspection of this device and test its parts, as the appellants contend, the delicate adjustment of the parts and the workability of the unit would be lost. If the tensile strength of the spring and diaphram must be tested by the respondent, as is suggested, those parts would be completely destroyed. There is not even anything in the evidence to indicate that anything more could have been done by the respondent, had internal inspection been made, than had already been done by the manufacturer of the device. The manufacturer had inspected and tested each part, and twice tested the completed unit under operating conditions. The respondent had made such external inspection as was possible and had then twice tested the device in actual operation. It worked when the dealer installed the heater in the appellants' home and at least twice thereafter, once immediately after it was installed and again three months later, on both of which occasions Richard O'Rourke relit the pilot after it had been put out or had gone out. It worked when installed and was working three months later, and the reason it failed to work on the occasion in question is left entirely to

conjecture. Although the burden of proving negligence rested upon the appellants there is an entire absence of evidence even tending to show that any defective condition existed at the time the device was used in the manufacture of the water heater or for some months thereafter.

The article in question, the safety pilot, came to the respondent as a sealed unit. Its very nature precluded an internal inspection and any such inspection would have necessarily destroyed the adjustment of its parts, which was essential to its operation. In such a case as this the rule relied upon by the appellants does not require the making of inspections and tests other than those which may be made without destroying the usefulness of the article.

We conclude that the rules in question did not require the respondent to make internal inspections and tests of this complicated and delicate device which came to it finely adjusted and sealed, and that under such circumstances such external inspections and tests as were possible were all that was required of it in the exercise of ordinary and reasonable care. There being no evidence of negligence on the part of the respondent, it follows that the action of the court was correct.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 5, 1939.