[Civ. No. 23172.   Second Dist., Div. One.   Mar. 6, 1959.]

GOLDIE J. EDISON et al., Respondents, v. LEWIS MANU-
FACTURING COMPANY (a Copartnership) et al.,
Defendants; NORTH AND JUDD MANUFACTURING
COMPANY (a Corporation), Appellant.

Parker, Stansbury, Reese & McGee and A. P. G. Steffes for Appellant.

Miller, Jones & Tollefson and Philip F. Jones for Respondents.

WHITE, P. J.—This action was instituted by plaintiffs, the widow and minor children of Edward L. Edison to recover damages sustained by them and resulting from his death when he fell from an oil well derrick on December 15, 1953. Trial was had before a jury which returned a verdict in favor of plaintiffs and against defendant North and Judd Manufacturing Company, a corporation, for the sum of $79,000. From the judgment entered upon the verdict, and from the denial by the trial court of its motion for judgment in its favor notwithstanding the verdict, defendant North and Judd Manufacturing Company prosecutes this appeal.

When the presentation of evidence had been concluded, said defendant moved the court for a directed verdict, which motion was denied.

There has been presented to this court a written stipulation limiting the issues to be determined on this appeal. In that regard, the stipulation reads as follows:

"1. Defendant-Appellant North & Judd Mfg. Co., will limit its appeal herein to a determination of whether the trial court erred in denying said defendant-appellant's motion for a directed verdict in favor of said defendant, and whether said court further erred in denying the motion of said defendant-appellant for a judgment in its favor notwithstanding the verdict of the jury.

"It Is FURTHUR STIPULATED that said defendant-appellant expressly waived its right to a new trial herein at the time of the hearing of its motion therefor on September 30, 1957, and does now waive any claim or right to a reversal of the judgment and/or order appealed from herein, except a reversal with directions to enter judgment in favor of said defendant-appellant. It is specifically understood that the defendant-appellant intends to show:

"*First*: That, considering all competent evidence, and all proper inferences and deductions therefrom, there is no substantial evidence in the record to prove any negligence on the

part of said defendant-appellant, which proximately caused the death of Edward L. Edison; and

"*Secondly*: That, in any event, the deceased was contributorily negligent as a matter of law." No errors are urged, predicated upon the admission or rejection of evidence or in the giving or refusing of any instruction.

Insofar as material to the disposition of this appeal, the factual background surrounding this litigation may be epitomized as follows: On December 15, 1953, Edward L. Edison, 33 years of age, was employed by the firm of Kee and Simpson, in Ventura County, California, as an oil derrickman, a job which he had held for some time prior thereto. In this capacity, Edison on that date was working on an oil derrick at a point about 90 feet from the ground, and was wearing a safety belt furnished by his employer for his protection in the event that he should slip and fall. Attached to the back of this safety belt, there was a D-shaped metal ring which was manufactured by bending a short steel rod into shape and then welding the two ends together in the center of the ring's straight side. The straight side of this ring was enclosed by a close fitting metal sleeve or tube, and by the belting itself, so that it was not visible or subject to visual inspection. This ring was inserted into the back of the safety belt by the belt manufacturer for the purpose of securing a rope or line thereto, which is in turn anchored at its other end to the derrick on which the man is working. This is the manner in which the belt and ring were being used by Edison on the date mentioned.

The D-ring on the back of decedent's safety belt was manufactured by defendant North and Judd Manufacturing Company. The safety belt worn by Mr. Edison at the time of his death was purchased by a Mr. Crabtree, the foreman for Kee and Simpson, Edison's employer, on June 13, 1952. The belt was purchased from Bethlehem Supply Company, according to the purchase records of Kee and Simpson. It was referred to as a "Weco-Lewis Derrickman's Safety Belt" in the purchase invoice. "Weco-Lewis" is one of the trade names for a derrickman's safety belt manufactured by a Mr. Charles T. Lewis, doing business as Lewis Manufacturing Company, in Oklahoma. Mr. Lewis bought all D-rings for his safety belts exclusively from defendant North and Judd Manufacturing Company, and had been doing so throughout the years 1938 through 1953. These rings, including the one on Edison's belt, were stamped with a number "4041," the word "tested,"

and an anchor trademark. When received by Lewis the D-rings were enclosed in a metal roller or sleeve on the straight side. Lewis had originally used a D-ring without markings, but changed to the number 4041 ring in 1938 when he saw it pictured in defendant North and Judd's catalog under the heading of "Safety Hardware," bearing the word "tested." In making the change to this ring, Lewis relied on the representation in defendant North and Judd Manufacturing Company's catalog that the ring was tested safety hardware. During the years 1951 through 1953 Lewis manufactured and sold about 3,000 belts per year, and never had belts in stock for more than 30 days from the date of their manufacture to date of shipment to purchasers. During this same period Lewis purchased the 4041 D-rings for his belts from defendant North and Judd in lots of between 500 and 1,000. He received shipments of such rings from North and Judd every month or two.

Lewis sold his belts to oil field supply companies, and according to his business records, Bethlehem Supply Company customarily ordered and was supplied such belts by Lewis under the designation "Weco-Lewis." According to the records of the Bethlehem Supply Company, its Los Angeles office transferred four "Weco-Lewis" safety belts, without straps, to its Castaic store on March 29, 1952, one of which was the one sold to Kee and Simpson, decedent's employer, on June 13, 1952. These four were part of a shipment of 20 belts ordered from the Lewis Company and received on August 1, 1951, by the Los Angeles office of Bethlehem Supply.

Defendant North and Judd Manufacturing Company, through its agents, knew the use to which Lewis was putting its 4041 D-ring, at least since the year 1946, and the exact manner in which the D-ring and belts were being used. Its sales agent called on Lewis every 90 days following World War II, and always discussed the product manufactured by Lewis. In addition, at the request of defendant North and Judd Manufacturing Company's home office, Lewis furnished said defendant with his illustrated catalog, showing the manner in which the latter's D-rings were used in a Lewis derrickman's safety belt, and the purposes for which the belt was intended. During all the years prior to the accident defendant North and Judd Manufacturing Company represented its D-ring as being "thoroughly tested," never indicated any concern over the soundness of each D-ring it sold to Lewis for his known purpose, and never suggested that some other type

of ring would be more suitable. However, after being informed by Lewis of the accident in which Edison was killed, said defendant subsequently wrote to Lewis and admitted that a portion of its welded hardware which passed its production tests was not reliable where shock loads were involved.

Defendant North and Judd Manufacturing Company, through its home office sales manager, knew of the use of its welded D-ring by other safety belt manufacturers as well as Lewis. Other than its use in safety belts and associated equipment, no other uses or intended uses for this D-ring are revealed by the record on appeal.

Defendant North and Judd Manufacturing Company's manufacturing, testing and inspection processes for its number 4041 D-ring were the same for the years 1950 through 1955. The first step of the manufacturing process consisted of cutting and forming the rings from large coils of $3/8$-inch wire, composed of a low carbon steel. The rings were then cleaned and welded. The welding operation was performed by an electric welding machine in a process known as "buttwelding" or "resistance welding." This is a method by which the ends of the metal to be joined are welded together in an instant by the machine, through an intense electric current which heats the metal ends to a plastic state accompanied by great mechanical pressure, or "push-up."

Following the welding operation the rings were smoothed by tumbling in sand and water and then subjected to the defendant manufacturer's testing machine. This machine put a concentrated outward bending force against the inner edge of the ring at the weld, by means of a lever which slowly applied and then withdrew a 582-pound load at that point on the ring. Each of the 4041 D-rings marked "tested" were subjected to this loading test. Each ring was then placed in a form the same shape as the ring in order to determine that the ring had retained its original shape. At the same time each ring was visually inspected for visible fractures in the weld. The rings were then plated, stamped as heretofore described, and enclosed in a sheet metal roller on its straight side so that the weld was no longer visible. The procedure just described was the complete testing method used by defendant manufacturer, and no other tests were given to the product. Some of the rings welded by said defendant's machines failed to pass its testing procedure. The number of "rejects" varied from day to day. The foregoing evidentiary narrative presents the evidence in a light most favorable to plaintiffs, as

we are required to do on appeal by defendant. However, appellant, while admitting that the "D" ring was manufactured by it nevertheless, contends that, "There is no evidence in the entire record which either directly or indirectly shows that appellant or any of its officers, agents or employees or Lewis Manufacturing Company or anyone connected with that company or any other person whatsoever had any knowledge, information or belief that any "D" ring manufactured by appellant and sold to Lewis Manufacturing Company since 1937 and prior to the accident, contained any defect whatsoever in the weld or otherwise. More specifically there is no evidence whatsoever in the entire record that the method of manufacture and testing used by appellant when it manufactured Exhibit 5 (the D-ring) was not according to sound and accepted engineering principles." Appellant North and Judd Manufacturing Company does not dispute the fact that knowledge was imputed to it, from information received by its salesman in Oklahoma of the fact that the "D" ring was being used in a safety belt manufactured and sold by Lewis Manufacturing Company. Appellant further insists that there is no evidence in the record that prior to the weld being broken the unwelded portion was visible in any way upon inspection. That all evidence was to the contrary and the defect, if it can be called a defect, was *latent*.

Under the foregoing stipulation the only issue to be determined on this appeal is whether the trial court erroneously denied appellant's motions for a directed verdict and for judgment notwithstanding the verdict.

In the determination of this issue we are confronted with the well established rule that such motions may be granted by the trial court only when "disregarding conflicting evidence, and giving to plaintiffs' evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff." (*Tremeroli* v. *Austin Trailer Equip. Co.*, 102 Cal.App.2d 464, 478 [227 P.2d 923]; *Garcia* v. *San Gabriel Ready Mixt*, 155 Cal. App.2d 568, 571-572 [318 P.2d 145].)

By their complaint, respondents charged appellant with negligence in that the fatal fall of Mr. Edison was caused solely and proximately because the "D" shaped ring on the safety belt was "defectively and weakly constructed and manufactured" by appellant, and that said "D" ring was

". . . not capable of withstanding the strain of a fall by any person wearing the same," all of which it was alleged was ". . . known or should have been known . . ." by appellant at the time it manufactured the "D" ring and sold it to Lewis Manufacturing Company.

Relying on the case of *Stultz* v. *Benson Lumber Co.*, 6 Cal.2d 688, 690, 691 [59 P.2d 100], appellant asserts that the manufacturer of a component part which is assembled or incorporated into a finished product is not liable for negligence. In other words, that the liability, if any, applies only to the manufacturer of the finished product (Lewis Manufacturing Co., herein), and not to "manufacturer of the component parts" (appellant herein). As we read the case just cited we are impressed that while the court discussed the question, it did not actually decide it. Appellant concedes that the decision which affirmed an order sustaining a demurrer without leave to amend was based on the ground that the alleged negligent conduct of the manufacturer of the "finished product" constituted an intervening cause. However, whatever may be said of the protective arm thrown around the manufacturer as a general rule, we are satisfied that the trend of judicial decisions has been to establish exceptions to this general rule and to extend these exceptions to include additional classes of cases not heretofore included.

That such is the rule in California was emphasized by our Supreme Court in the case of *Kalash* v. *Los Angeles Ladder Co.*, 1 Cal.2d 229, wherein it is said at pages 231, 232 [34 P.2d 481] : "The language of Mr. Justice Cardozo, while a member of the New York Court of Appeals, in the case of *MacPherson* v. *Buick Motor Co.*, 217 N.Y. 382 [111 N.E. 1050, Ann.Cas. 1916C 440, L.R.A. 1916F 696], seems appropriate:

" 'We hold, then, that the principle of *Thomas* v. *Winchester*, 6 N.Y. 397 [57 Am.Dec. 455], is not limited to poisons, explosives, and things of like nature, to things which in their normal operation are implements of destruction. If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully. That is as far as we are required to go for the decision of this case. . . . In such circumstances,

the presence of a known danger, attendant upon a known use, makes vigilance a duty. We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else. We have put the source of the obligation where it ought to be. We have put its source in the law.'

''The same learned justice, in his work entitled 'The Growth of the Law,' comments further upon this subject as follows (The Growth of the Law, 1924 ed., p. 77) : 'The development is merely a phase of the assault, now extending along the entire line, upon the ancient citadel of privity. In New York, there is a remedy in tort, regardless of privity against the negligent manufacturer, where the subject of the manufacture is likely to be dangerous to life (*MacPherson* v. *Buick Motor Co.*, 217 N.Y. 382 [111 N.E. 1050, Ann.Cas. 1916C 440, L.R.A. 1916F 696].) The things classified as dangerous have been steadily extended with a corresponding extension of the application of the remedy. They began with *Thomas* v. *Winchester*, 6 N.Y. 397 [57 Am.Dec. 455], and the sale of poisons. They have been widened until they include a scaffold (*Devlin* v. *Smith*, 89 N.Y. 470 [42 Am.Rep. 311] or an automobile (*MacPherson* v. *Buick Motor Co.*, *supra*), or even pies or cakes when nails and other foreign substances have supplied ingredients not mentioned in the recipes of cook books.' '' (See also *O'Rourke* v. *Day & Night Water Heater Co., Ltd.*, 31 Cal.App.2d 364, 366 [88 P.2d 191].) In *Sherward* v. *Virtue*, 20 Cal.2d 410, 414 [126 P.2d 345], the court said: ''The appropriate standard of care applicable to the facts of the present case is expressed in *O'Rourke* v. *Day & Night Water Heater Co., Ltd., supra*, to the effect that if the defective condition of the part could have been disclosed by reasonable inspection and tests and such inspection and tests had been omitted, the defendant has been negligent. In *Smith* v. *Peerless Glass Co., Inc.*, 259 N.Y. 292 [181 N.E. 576], it was held that reasonable care consisted of making the inspections and tests during the course of manufacture and after the article was completed which the manufacturer should recognize were reasonably necessary to secure the production of a safe article.''

The principle was also discussed in the leading case of *Smith* v. *Peerless Glass Co.*, 259 N.Y. 292 [181 N.E. 576], as was also the fact that Justice Cardozo had left the question open in *MacPherson* v. *Buick Motor Co.*, 217 N.Y. 382 [111

N.E. 1050, Ann.Cas. 1916C 440, L.R.A. 1916F 696]. The court had this to say: ". . . The doubt seemed to hang on the problem of causation. Whatever was shadowy then in respect to the principles both of negligence and of causation has vanished in the light of subsequent decisions." (Citations omitted.)

". . . There emerges, we think, a broad rule of liability applicable to the manufacturer of any chattel, *whether it be a component part or an assembled entity.* Stated with reference to the facts of this particular case, it is that, if either defendant was negligent in circumstances pointing to an unreasonable risk of serious bodily injury to one in plaintiff's position, liability may follow *though privity is lacking.*" (Emphasis added.) (See also *Willey* v. *Fyrogas Co.,* 363 Mo. 406 [251 S.W.2d 635, 640, 641] ; *American Radiator & S. S. Corp.* v. *Titan Valve & Mfg. Co.* (U.S.D.C., N.D. Ohio, 1956), 144 F.Supp. 841, 847.)

However, whether or not, as contended by appellant, the evidence shows, *as a matter of law,* freedom from actionable negligence in the construction of the "D" ring, presents a more serious question, and necessarily involves an analysis of the testimony offered by respondents to establish their claim in that regard. Appellant earnestly urges that no showing whatsoever was made that the defect in the particular "D" ring here involved could have been discovered by the exercise of ordinary care. That therefore, since respondents' evidence showed that the alleged defect was *latent,* to hold appellant liable without any further showing of knowledge on its part would be to hold that appellant was an absolute insurer. It is argued that prior to the accident appellant had sold on the average of 2,500 "D" rings per year over a 15-year period, or in other words, had sold approximately 37,500 "D" rings to Lewis Manufacturing Company and there is no evidence that appellant ever received any complaint concerning this product or had any knowledge or notice that any of the "D" rings were only partially welded or were in any way defective. That the mere breaking of the ring, if it actually was broken in the fall of Edison, could not give rise to an inference that appellant was negligent in failing to discover the defect at the time it manufactured this "D" ring. In support of this contention, appellant relies heavily upon the case of *Trust* v. *Arden Farms Co.,* 50 Cal.2d 217, 220 [324 P.2d 583], wherein it was held that the manufacturer and purveyor of a bottle were not insurers. However, in that case, at page 221, the

court said: "Unless we are prepared to hold defendant as an insurer, it is hard to see how else it could be held responsible without some showing that its opportunity to exercise care was in some measure proportionate to the duty imposed— without some showing *that a more thorough inspection would have been effective.*" (Emphasis added.) In the case at bar there was expert testimony that the ends of the broken "D" ring had never been welded together in the central portion, in an area amounting to about one-fourth of the total cross-section of the ring, and that the ring broke at the point of the weld as a result of a "dynamic" or "shock" load. Dr. Clark, an expert witness, further testified that in order to produce a weld on a D-ring such as the one involved in this action which would be as strong as the rest of the ring, it should have a complete joint, with the same grain structure and composition of metal as the parent metal itself. In answer to appellant's contention that to discover a defect in the D-ring a "destructive" test would be required, that is one which after its use would destroy any future commercial use of the ring, Dr. David Wood, a professor of mechanical engineering at California Institute of Technology, described and illustrated a *nondestructive* method of testing the D-ring which he termed a "sizing operation." According to this expert, such a method would be more likely to reveal a hidden defect in the weld than appellant's test, and would simulate a condition of shock loading. *He testified that sizing operations had been used in the metal industry for a long time prior to 1950,* and that such sizing operations are used to test flash welds. After explaining the effect of stress concentration on the strength of a material, Dr. Wood stated that in one case he knew of, where the effect had been measured by experiment, the breaking point in a low carbon steel used in shipbuilding, and similar to the D-ring material, had been found to be as low as one-fifth the normal strength of such steel when a stress concentration was present.

In reply to a hypothetical question assuming the circumstances of Edison's fall, Dr. Wood testified that the force produced under such circumstances would exceed 4,000 pounds. In fact he estimated that the fall in this case resulted in a maximum force of 4,800 pounds. He also stated that the absence of weld in the central portion of Edison's D-ring was, in his opinion, the cause of the ring's fracture when Edison fell.

The witness further testified that the load carrying capacity of the entire D-ring itself, as compared to the rod of which it was composed, would be slightly less than twice as much, assuming the weld was complete; in other words, a completely welded D-ring would require almost twice as much load to break it as would a straight piece of the rod from which it was made. Dr. Wood explained this by pointing out that pulling the ring to fracture would deform it to the point where there would finally be a rough similarity to two wires being pulled in tension. This was corroborated by appellant's own expert, who produced records of the breaking point of several of appellant's D-rings which he had actually pulled to destruction. They broke at loads varying from 9,600 pounds to 10,000 pounds.

Another expert witness, Robert Hiller, a metallurgist and testing engineer, testified he was Technical Director for Triplett & Barton, Inc., a materials testing laboratory, particularly in the metallurgical field. That through his work and experience he was acquainted with the flash-welding method of production welds, including metal parts as small as three-eighths of an inch in diameter. He declared that he was familiar through experience, background and training with the various nondestructive methods of testing and that his experience in this field extended back to 1945 or 1946.

Mr. Hiller also testified that he was familiar with the testing and inspection procedures that would be in accordance with good engineering principles, insofar as ascertaining that the weld in a flash-welding process, such as used in manufacturing the appellant's D-ring, was at least as strong as the parent metal itself. Mr. Hiller was then asked what would be a good test and inspection process for the D-ring in order to determine that the weld was at least as strong as the parent metal. He stated the only way to be absolutely certain of this would be to break the weld in tension, a destructive test. *As to a suitable nondestructive inspection method for such welds, however, which would be in accordance with good engineering practice,* he said that *the only reliable and satisfactory procedure* found for flash-welds was to subject them to a suitable predetermined proof-load test across the weld. He further pointed out that proper inspection on an item such as appellant's D-ring required adequate controls for the equipment used in the process, as well as the product. In this regard, he stated that there are engineering procedures which it is good practice to carry out with relation to the

equipment. In the case of flash-welding equipment, Hiller stated that one of the methods commonly used to check the machine settings, in order to insure consistency, *is to make sample joints at the beginning of each day's production which are then tested to destruction in order to make certain the weld being produced is as strong as the base metal. Once the settings were checked by this method and the weld thereby produced found to be satisfactory, Hiller testified, production for the day could be commenced. Then, periodically during the day's production, a sample should be tested to destruction to insure continued satisfactory performance.* He stated that in the case of appellant's D-ring one or two rings being so tested from each batch or shipment as made would be a relatively economical and satisfactory method of checking on consistency, because the welding machines tend to make a rather uniform job, within limits. *If the machine controls get out of line, he said, to the point of making a faulty weld, there is a good probability that the ones following will also be faulty, and the inspection control he recommended would protect against that sort of process defect.* He stated that in his opinion such a method of testing or inspection would be desirable, in accordance with good engineering principles, in addition to a nondestructive proof-loading on the rings. *He further testified that these inspection processes were in effect since the middle 1940's, to his knowledge.*

*When appellant's production test (Exhibit 25) was described to Mr. Hiller, he stated that such a test would be particularly sensitive to defects on the top side of the weld but particularly insensitive to defects on the bottom side, and not very sensitive to defects in the interior or center portion.* On cross-examination Hiller described a proof-loading method conducted by his firm for welded air cargo rings. He stated that they had tested a great many of these rings, and that they were of a similar diameter to appellant's D-ring. He then described the method used in proof-loading these rings, which was the same as the method recommended by Dr. Wood (sizing operation) insofar as applying a tensile pull to the weld by means of close-fitting jigs, rather than the bending force used in appellant's test. He pointed out that this arrangement, which he diagrammed while testifying *made it possible to subject the weld joint to a much higher test load, without deforming or stretching the ring, than would be possible with appellant's testing method.*

■ Appellant's procedure from the first step of the manufacturing process for its D-rings until the completion thereof has heretofore been set forth in detail and need not here be repeated. We are satisfied that under the state of the evidence herein it cannot be said that as a matter of law, under the foregoing rules enunciated, appellant was free from actionable negligence in the construction and testing of its D-rings, and therefore, it was a proper question of fact for the jury as to whether feasible means of discovering defects in the D-rings were available to appellant and whether it was shown that more reasonably practicable methods of testing were used in the industry than the method of testing adopted by appellant. In other words, did appellant's testing of its D-ring welds meet the standard of sound and accepted engineering practices in the flash-welding industry? Manifestly, under the conflicting evidence presented by the record before us, that was a question to be resolved by the duly constituted arbiters of the facts.

■ Appellant contends that, "In view of the absolutely perfect 'service experience' of the defendant up to the time it manufactured and tested the ring in question, how can it be said that the defendant was negligent in continuing to use the same method of manufacturing and testing its 'D' rings?" As heretofore pointed out, prior to the accident appellant had sold approximately 2,500 D-rings per year over a period of 15 years without any complaint concerning the product. But there is no evidence when if ever appellant's product was subjected to the ultimate test of dependability—the fall of a worker wearing one or a "drop test." Furthermore, evidence of no previous accidents is not admissible to prove due care (*Thompson* v. *B. F. Goodrich Co.*, 48 Cal.App.2d 723, 729 [120 P.2d 693]; *Owen* v. *Rheem Mfg. Co.*, 83 Cal.App.2d 42, 50 [187 P.2d 785]).

■ Appellant earnestly urges that it had no knowledge or information from which it could determine the required strength of any D-ring which it manufactured and sold to Lewis Manufacturing Co. However, it is conclusively shown that appellant was apprised of the fact that the ring was put in a safety belt for the purpose of arresting a man's fall, and therefore could be subject to a "shock load." This knowledge of a known danger, upon a known use, makes vigilance a duty. Appellant also held out its product as "tested safety hardware." It was for the jury to determine whether, since appellant's production test admittedly failed

to eliminate welds which were not as strong as the parent metal, that appellant's failure to utilize other tests which were recognized as good and sound engineering procedures in the field of flash-welding, established negligence on its part.

Finally, appellant contends that the decedent Edison was guilty of contributory negligence as a matter of law. In this regard, appellant argues that Mr. Edison could not have fallen off the end of the monkey-board had he shortened the rope or life-line to $5\frac{1}{2}$ feet. That in the absence of any emergency, he chose to work with a longer ($8\frac{1}{2}$ feet) rope. That having, so to speak, a choice between methods of performing his work, and which were equally available, Edison chose the more dangerous of the methods, and must therefore be deemed negligent. Appellant asserts that had Edison shortened the rope it would have been physically impossible for him to fall over the end of the monkey-board as, says appellant, "he obviously did." But, as pointed out by respondent, "The safety belt worn by Edison at the time of his death was sold for the purpose of saving a derrickman's life if he falls. The derrickman depends on another restraining device known as a 'belly buster' to lean on and prevent him from falling over the end of the 'monkey board', but the 'belly buster' is not attached to the person. The line attached to the safety belt requires sufficient length to permit the wearer to walk around to all points on the derrick platform while working. The tail rope connected to Edison's belt was tied to the railing with at least a foot and one-half of knots so that it would have been quite difficult to shorten. The Petroleum Safety Orders of California in effect on the day of Edison's death required every safety belt, including rings and other fittings thereon which are depended on to sustain a falling person, to be of a type capable of withstanding the force of a 200-pound weight falling five feet. (*Cal. Admin. Code, Title* 8, § 6580 (c).) This was approximately the distance Edison fell. Even if the rope had been shortened, as appellant now claims it should have been, there would have been just as much or more slack if Edison had fallen over the side of the 'monkey board', rather than the end." Under the facts and circumstances here present we perceive no valid grounds upon which to predicate a holding that the workman was as a matter of law, contributorily negligent in permitting the safety belt to be put to the test for which it was manufactured and furnished to him.

For the foregoing reasons, the judgment and the order from which this appeal was taken are, and each is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied April 2, 1959, and appellant's petition for a hearing by the Supreme Court was denied April 29, 1959.