[S. F. No. 16951. In Bank. July 5, 1944.]

GLADYS ESCOLA, Respondent, v. COCA COLA BOTTLING COMPANY OF FRESNO (a Corporation), Appellant.

454

H. K. Landram for Appellant.

C. Ray Robinson, Willard B. Treadwell, Dean S. Lesher, Loraine B. Rogers, Belli & Leahy and Melvin M. Belli for Respondent.

GIBSON, C. J.—Plaintiff, a waitress in a restaurant, was injured when a bottle of Coca Cola broke in her hand. She alleged that defendant company, which had bottled and delivered the alleged defective bottle to her employer, was negligent in selling "bottles containing said beverage which on account of excessive pressure of gas or by reason of some defect in the bottle was dangerous . . . and likely to explode." This appeal is from a judgment upon a jury verdict in favor of plaintiff.

Defendant's driver delivered several cases of Coca Cola to the restaurant, placing them on the floor, one on top of the other, under and behind the counter, where they remained at least thirty-six hours. Immediately before the accident, plaintiff picked up the top case and set it upon a near-by ice cream cabinet in front of and about three feet from the refrigerator. She then proceeded to take the bottles from the case with her right hand, one at a time, and put them into the refrigerator. Plaintiff testified that after she had placed three bottles in the refrigerator and had moved the fourth bottle about eighteen inches from the case "it exploded in my hand." The bottle broke into two jagged pieces and inflicted a deep five-inch cut, severing blood vessels, nerves and muscles of the thumb and palm of the hand. Plaintiff further testified that when the bottle exploded, "It made a sound similar to an electric light bulb that would have dropped. It made a loud pop." Plaintiff's employer testified, "I was about twenty feet from where it actually happened and I heard the explosion." A fellow employee, on the opposite side of the counter, testified that plaintiff "had the bottle, I should judge, waist high, and I know that it didn't bang either the case or the door or another bottle . . . when it popped. It sounded just like a fruit jar would blow up. . . ." The witness further testified that the contents of the bottle "flew all over herself and myself and the walls and one thing and another."

The top portion of the bottle, with the cap, remained in plaintiff's hand, and the lower portion fell to the floor but did not break. The broken bottle was not produced at the trial, the pieces having been thrown away by an employee of the restaurant shortly after the accident. Plaintiff, however, described the broken pieces, and a diagram of the bottle was made showing the location of the "fracture line" where the bottle broke in two.

One of defendant's drivers, called as a witness by plaintiff, testified that he had seen other bottles of Coca Cola in the past explode and had found broken bottles in the warehouse when he took the cases out, but that he did not know what made them blow up.

Plaintiff then rested her case, having announced to the court that being unable to show any specific acts of negligence she relied completely on the doctrine of res ipsa loquitur.

Defendant contends that the doctrine of res ipsa loquitur does not apply in this case, and that the evidence is insufficient to support the judgment.

Many jurisdictions have applied the doctrine in cases involving exploding bottles of carbonated beverages. (See *Payne* v. *Rome Coca-Cola Bottling Co.*, 10 Ga.App. 762 [73 S.E. 1087]; *Stolle* v. *Anheuser-Busch*, 307 Mo. 520 [271 S.W. 497, 39 A.L.R. 1001]; *Bradley* v. *Conway Springs Bottling Co.*, 154 Kan. 282 [118 P.2d 601]; *Ortego* v. *Nehi Bottling Works*, 199 La. 599 [6 So.2d 677]; *MacPherson* v. *Canada Dry Ginger Ale, Inc.*, 129 N.J.L. 365 [29 A.2d 868]; *Macres* v. *Coca-Cola Bottling Co.*, 290 Mich. 567 [287 N.W. 922]; *Benkendorfer* v. *Garrett* (Tex. Civ. App.), 143 S.W.2d 1020.) Other courts for varying reasons have refused to apply the doctrine in such cases. (See *Gerber* v. *Faber*, 54 Cal.App.2d 674 [129 P.2d 485]; *Loebig's Guardian* v. *Coca-Cola Bottling Co.*, 259 Ky. 124 [81 S.W.2d 910]; *Stewart* v. *Crystal Coca-Cola Bottling Co.*, 50 Ariz. 60 [68 P.2d 952]; *Glaser* v. *Seitz*, 35 Misc. 341 [71 N.Y.S. 942]; *Luciano* v. *Morgan*, 267 App. Div. 785 [45 N.Y.S.2d 502]; *cf. Berkens* v. *Denver Coca-Cola Bottling Co.*, 109 Colo. 140 [122 P.2d 884]; *Ruffin* v. *Coca Cola Bottling Co.*, 311 Mass. 514 [42 N.E.2d 259]; *Slack* v. *Premier-Pabst Corporation*, 40 Del. 97 [5 A.2d 516]; *Wheeler* v. *Laurel Bottling Works*, 111 Miss. 442 [71 So. 743, L.R.A. 1916E 1074]; *Seven-Up Bottling Co.* v. *Gretes*, —— Va. —— [27 S.E.2d 925]; *Dail* v. *Taylor*, 151 N.C. 284 [66 S.E. 135, 28 L.R.A.N.S. 949].) It would serve no useful purpose to discuss the reasoning of the foregoing cases in detail, since the problem is whether under the facts shown in the instant case the conditions warranting application of the doctrine have been satisfied.

Res ipsa loquitur does not apply unless (1) defendant had exclusive control of the thing causing the injury and (2) the accident is of such a nature that it ordinarily

would not occur in the absence of negligence by the defendant. (*Honea* v. *City Dairy, Inc.*, 22 Cal.2d 614, 616-617 [140 P.2d 369], and authorities there cited; *cf. Hinds* v. *Wheadon*, 19 Cal.2d 458, 461 [121 P.2d 724]; Prosser on Torts [1941], 293-301.)

Many authorities state that the happening of the accident does not speak for itself where it took place some time after defendant had relinquished control of the instrumentality causing the injury. Under the more logical view, however, the doctrine may be applied upon the theory that defendant had control at the time of the alleged negligent act, although not at the time of the accident, *provided* plaintiff first proves that the condition of the instrumentality had not been changed after it left the defendant's possession. (See cases collected in *Honea* v. *City Dairy, Inc.*, 22 Cal.2d 614, 617-618 [140 P.2d 369].) As said in *Dunn* v. *Hoffman Beverage Co.*, 126 N.J.L. 556 [20 A.2d 352, 354], "defendant is not charged with the duty of showing affirmatively that something happened to the bottle after it left its control or management; . . . to get to the jury the plaintiff must show that there was due care during that period." Plaintiff must also prove that she handled the bottle carefully. The reason for this prerequisite is set forth in Prosser on Torts, *supra*, at page 300, where the author states: "Allied to the condition of exclusive control in the defendant is that of absence of any action on the part of the plaintiff contributing to the accident. Its purpose, of course, is to eliminate the possibility that it was the plaintiff who was responsible. If the boiler of a locomotive explodes while the plaintiff engineer is operating it, the inference of his own negligence is at least as great as that of the defendant, and res ipsa loquitur will not apply until he has accounted for his own conduct." (See, also, *Olson* v. *Whitthorne & Swan*, 203 Cal. 206, 208-209 [263 P. 518, 58 A.L.R. 129].) It is not necessary, of course, that plaintiff eliminate every remote possibility of injury to the bottle after defendant lost control, and the requirement is satisfied if there is evidence permitting a reasonable inference that it was not accessible to extraneous harmful forces and that it was carefully handled by plaintiff or any third person who may have moved or touched it. (*Cf.* Prosser, *supra*, p. 300.) If such evidence is presented, the question becomes one for the trier of fact (see, e. g.,

*MacPherson* v. *Canada Dry Ginger Ale, Inc.*, 129 N.J.L. 365 [29 A.2d 868, 869]), and, accordingly, the issue should be submitted to the jury under proper instructions.

In the present case no instructions were requested or given on this phase of the case, although general instructions upon res ipsa loquitur were given. Defendant, however, has made no claim of error with reference thereto on this appeal.

Upon an examination of the record, the evidence appears sufficient to support a reasonable inference that the bottle here involved was not damaged by any extraneous force after delivery to the restaurant by defendant. It follows, therefore, that the bottle was in some manner defective at the time defendant relinquished control, because sound and properly prepared bottles of carbonated liquids do not ordinarily explode when carefully handled.

The next question, then, is whether plaintiff may rely upon the doctrine of res ipsa loquitur to supply an inference that defendant's negligence was responsible for the defective condition of the bottle at the time it was delivered to the restaurant. Under the general rules pertaining to the doctrine, as set forth above, it must appear that bottles of carbonated liquid are not ordinarily defective without negligence by the bottling company. In 1 Shearman and Redfield on Negligence (rev. ed. 1941), page 153, it is stated that: "The doctrine . . . requires evidence which shows at least the probability that a particular accident could not have occurred without legal wrong by the defendant."

An explosion such as took place here might have been caused by an excessive internal pressure in a sound bottle, by a defect in the glass of a bottle containing a safe pressure, or by a combination of these two possible causes. The question is whether under the evidence there was a probability that defendant was negligent in any of these respects. If so, the doctrine of res ipsa loquitur applies.

The bottle was admittedly charged with gas under pressure, and the charging of the bottle was within the exclusive control of defendant. As it is a matter of common knowledge that an overcharge would not ordinarily result without negligence, it follows under the doctrine of res ipsa loquitur that if the bottle was in fact excessively charged an inference of defendant's negligence would arise. If

the explosion resulted from a defective bottle containing a safe pressure, the defendant would be liable if it negligently failed to discover such flaw. If the defect were visible, an inference of negligence would arise from the failure of defendant to discover it. Where defects are discoverable, it may be assumed that they will not ordinarily escape detection if a reasonable inspection is made, and if such a defect is overlooked an inference arises that a proper inspection was not made. A difficult problem is presented where the defect is unknown and consequently might have been one not discoverable by a reasonable, practicable inspection. In the Honea case we refused to take judicial notice of the technical practices and information available to the bottling industry for finding defects which cannot be seen. In the present case, however, we are supplied with evidence of the standard methods used for testing bottles.

A chemical engineer for the Owens-Illinois Glass Company and its Pacific Coast subsidiary, maker of Coca Cola bottles, explained how glass is manufactured and the methods used in testing and inspecting bottles. He testified that his company is the largest manufacturer of glass containers in the United States, and that it uses the standard methods for testing bottles recommended by the glass containers association. A pressure test is made by taking a sample from each mold every three hours—approximately one out of every 600 bottles—and subjecting the sample to an internal pressure of 450 pounds per square inch, which is sustained for one minute. (The normal pressure in Coca Cola bottles is less than 50 pounds per square inch.) The sample bottles are also subjected to the standard thermal shock test. The witness stated that these tests are ''pretty near'' infallible.

It thus appears that there is available to the industry a commonly-used method of testing bottles for defects not apparent to the eye, which is almost infallible. Since Coca Cola bottles are subjected to these tests by the manufacturer, it is not likely that they contain defects when delivered to the bottler which are not discoverable by visual inspection. Both new and used bottles are filled and distributed by defendant. The used bottles are not again subjected to the tests referred to above, and it may be inferred that defects not discoverable by visual inspection do not develop in bottles after they are manufactured. Obviously, if such defects do

occur in used bottles there is a duty upon the bottler to make appropriate tests before they are refilled, and if such tests are not commercially practicable the bottles should not be re-used. This would seem to be particularly true where a charged liquid is placed in the bottle. It follows that a defect which would make the bottle unsound could be discovered by reasonable and practicable tests.

Although it is not clear in this case whether the explosion was caused by an excessive charge or a defect in the glass, there is a sufficient showing that neither cause would ordinarily have been present if due care had been used. Further, defendant had exclusive control over both the charging and inspection of the bottles. Accordingly, all the requirements necessary to entitle plaintiff to rely on the doctrine of res ipsa loquitur to supply an inference of negligence are present.

It is true that defendant presented evidence tending to show that it exercised considerable precaution by carefully regulating and checking the pressure in the bottles and by making visual inspections for defects in the glass at several stages during the bottling process. It is well settled, however, that when a defendant produces evidence to rebut the inference of negligence which arises upon application of the doctrine of res ipsa loquitur, it is ordinarily a question of fact for the jury to determine whether the inference has been dispelled. (*Druzanich* v. *Criley,* 19 Cal.2d 439, 444 [122 P.2d 53]; *Michener* v. *Hutton,* 203 Cal. 604, 610 [265 P. 238, 59 A.L.R. 480].)

The judgment is affirmed.

Shenk, J., Curtis, J., Carter, J., and Schauer, J., concurred.

TRAYNOR, J.—I concur in the judgment, but I believe the manufacturer's negligence should no longer be singled out as the basis of a plaintiff's right to recover in cases like the present one. In my opinion it should now be recognized that a manufacturer incurs an absolute liability when an article that he has placed on the market, knowing that it is to be used without inspection, proves to have a defect that causes injury to human beings. *McPherson* v. *Buick Motor Co.*, 217 ‚ 382 [111 N.E. 1050, Ann.Cas. 1916C 440, L.R.A. 1916F established the principle, recognized by this court, that irrespective of privity of contract, the manufacturer

462

sible for an injury caused by such an article to any person who comes in lawful contact with it. (*Sheward* v. *Virtue*, 20 Cal.2d 410 [126 P.2d 345] ; *Kalash* v. *Los Angeles Ladder Co.*, 1 Cal.2d 229 [34 P.2d 481].) In these cases the source of the manufacturer's liability was his negligence in the manufacturing process or in the inspection of component parts supplied by others. Even if there is no negligence, however, public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market. It is evident that the manufacturer can anticipate some hazards and guard against the recurrence of others, as the public cannot. Those who suffer injury from defective products are unprepared to meet its consequences. The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business. It is to the public interest to discourage the marketing of products having defects that are a menace to the public. If such products nevertheless find their way into the market it is to the public interest to place the responsibility for whatever injury they may cause upon the manufacturer, who, even if he is not negligent in the manufacture of the product, is responsible for its reaching the market. However intermittently such injuries may occur and however haphazardly they may strike, the risk of their occurrence is a constant risk and a general one. Against such a risk there should be general and constant protection and the manufacturer is best situated to afford such protection.

The injury from a defective product does not become a matter of indifference because the defect arises from causes other than the negligence of the manufacturer, such as negligence of a submanufacturer of a component part whose defects could not be revealed by inspection (see *Sheward* v. *Virtue*, 20 Cal.2d 410 [126 P.2d 345] ; *O'Rourke* v. *Day & Night Water Heater Co., Ltd.*, 31 Cal.App.2d 364 [88 P.2d 191] ; *ith* v. *Peerless Glass Co.*, 259 N.Y. 292 [181 N.E. 576]), or own causes that even by the device of res ipsa loquitur be classified as negligence of the manufacturer. The of negligence may be dispelled by an affirmative proper care. If the evidence against the fact in-

ferred is "clear, positive, uncontradicted, and of such a nature that it cannot rationally be disbelieved, the court must instruct the jury that the nonexistence of the fact has been established as a matter of law." (*Blank* v. *Coffin*, 20 Cal.2 457, 461 [126 P.2d 868].) An injured person, however, not ordinarily in a position to refute such evidence or iden the cause of the defect, for he can hardly be familiar with manufacturing process as the manufacturer himself is. leaving it to the jury to decide whether the inference has h dispelled, regardless of the evidence against it, the neglige rule approaches the rule of strict liability. It is needle circuitous to make negligence the basis of recovery and imp what is in reality liability without negligence. If public icy demands that a manufacturer of goods be responsibl their quality regardless of negligence there is no reason to fix that responsibility openly.

In the case of foodstuffs, the public policy of the state is formulated in a criminal statute. Section 26510 of the Health and Safety Code prohibits the manufacturing, preparing, compounding, packing, selling, offering for sale, or keeping for sale, or advertising within the state, of any adulterated food. Section 26470 declares that food is adulterated when "it has been produced, prepared, packed, or held under insanitary conditions whereby it may have been rendered diseased, unwholesome or injurious to health." The statute imposes criminal liability not only if the food is adulterated, but if its container, which may be a bottle (§ 26451), has any deleterious substance (§ 26470 (6)), or renders the product injurious to health. (§ 26470 (4)). The criminal liability under the statute attaches without proof of fault, so that the manufacturer is under the duty of ascertaining whether an article manufactured by him is safe. (*People* v. *Schwartz*, 28 Cal.App.2d Supp. 775 [70 P.2d 1017].) Statutes of this kind result in a strict liability of the manufacturer in tort to the member of the public injured. (See cases cited in Prosser, Torts, p. 693, note 69.)

The statute may well be applicable to a bottle whose defects cause it to explode. In any event it is significant that the statute imposes criminal liability without fault, reflecting the public policy of protecting the public from dangerous products placed on the market, irrespective of negligence in their manufacture. While the Legislature imposes criminal lia-

bility only with regard to food products and their containers, there are many other sources of danger. It is to the public interest to prevent injury to the public from any defective goods by the imposition of civil liability generally. The retailer, even though not equipped to test a product, under an absolute liability to his customer, for the implied warranties of fitness for proposed use and merchantable qual- include a warranty of safety of the product. (*Goetten Owl Drug Co.*, 6 Cal.2d 683 [59 P.2d 142]; *Mix* v. *Ingersoll ndy Co.*, 6 Cal.2d 674 [59 P.2d 144]; *Gindraux* v. *Maurice rcantile Co.*, 4 Cal.2d 206 [47 P.2d 708]; *Jensen* v. *Berris,* Cal.App.2d 537 [88 P.2d 220]; *Ryan* v. *Progressive Gro- Stores,* 255 N.Y. 388 [175 N.E. 105; 74 A.L.R. 339]; *e* v. *Krum,* 222 N.Y. 410 [118 N.E. 853, L.R.A. 1918F 2].) This warranty is not necessarily a contractual one *Chamberlain Co.* v. *Allis-Chalmers etc. Co.*, 51 Cal.App.2d 520, 524 [125 P.2d 113]; see 1 Williston on Sales, 2d ed., §§ 197-201), for public policy requires that the buyer be in- sured at the seller's expense against injury. (*Race* v. *Krum, supra; Ryan* v. *Progressive Grocery Stores, supra; Chapman* v. *Roggenkamp,* 182 Ill.App. 117, 121; *Ward* v. *Great Atlan- tic & Pacific Tea Co.*, 231 Mass. 90, 94 [120 N.E. 225, 5 A.L.R. 242]; see Prosser, *The Implied Warranty of Merchantable Quality,* 27 Minn.L.Rev. 117, 124; Brown, *The Liability of Retail Dealers For Defective Food Products,* 23 Minn.L.Rev. 585.) The courts recognize, however, that the retailer can- not bear the burden of this warranty, and allow him to re- coup any losses by means of the warranty of safety attending the wholesaler's or manufacturer's sale to him. (*Ward* v. *Great Atlantic & Pacific Tea Co.*, *supra;* see Waite, *Retail Responsibility and Judicial Law Making,* 34 Mich.L.Rev. 494, 509.) Such a procedure, however, is needlessly circuitous and engenders wasteful litigation. Much would be gained if the injured person could base his action directly on the manu- facturer's warranty.

The liability of the manufacturer to an immediate buyer injured by a defective product follows without proof of negli- gence from the implied warranty of safety attending the sale. Ordinarily, however, the immediate buyer is a dealer who does not intend to use the product himself, and if the warranty of safety is to serve the purpose of protecting health and safety it must give rights to others than the dealer. In the words

of Judge Cardozo in the McPherson case: "The dealer was indeed the one person of whom it might be said with some approach to certainty that by him the car would not be used. Yet, the defendant would have us say that he was the one person whom it was under a legal duty to protect. The law does not lead us to so inconsequent a solution." While the defendant's negligence in the McPherson case made it unnecessary for the court to base liability on warranty, Judge Cardozo's reasoning recognized the injured person as the party in interest and effectively disposed of the theory the liability of the manufacturer incurred by his warranty should apply only to the immediate purchaser. It thus paved the way for a standard of liability that would make the manufacturer guarantee the safety of his product even when there is no negligence.

This court and many others have extended protection according to such a standard to consumers of food products, taking the view that the right of a consumer injured by wholesome food does not depend "upon the intricacies law of sales" and that the warranty of the manufacturer to the consumer in absence of privity of contract rests on public policy. (*Klein* v. *Duchess Sandwich Co., Ltd.*, 14 Cal.2d 272, 282 [93 P.2d 799]; *Ketterer* v. *Armour & Co.*, 200 F. 321, 322, 323 [160 C.C.A. 111, L.R.A. 1918D 798]; *Decker & Sons* v. *Capps*, 139 Tex. 609 [164 S.W.2d 828, 142 A.L.R. 1479]; see Perkins, *Unwholesome Food As A Source of Liability*, 5 Iowa L.Bull. 6, 86.) Dangers to life and health inhere in other consumers' goods that are defective and there is no reason to differentiate them from the dangers of defective food products. (See Bohlen, Studies in Torts, Basis of Affirmative Obligations, American Cases Upon The Liability of Manufacturers and Vendors of Personal Property, 109, 135; Llewellyn, *On Warranty of Quality and Society*, 36 Col.L.Rev. 699, 704, note 14; Prosser, Torts, p. 692.)

In the food products cases the courts have resorted to various fictions to rationalize the extension of the manufacturer's warranty to the consumer: that a warranty runs with the chattel; that the cause of action of the dealer is assigned to the consumer; that the consumer is a third party beneficiary of the manufacturer's contract with the dealer. They have also held the manufacturer liable on a mere fiction of negli-

gence: "Practically he must know it [the product] is fit, or bear the consequences if it proves destructive." (*Parks* v. *C. C. Yost Pie Co.*, 93 Kan. 334 [144 P. 202, L.R.A. 1915C 179]; see Jeanblanc, *Manufacturer's Liability to Persons Other Than Their Immediate Vendees*, 24 Va.L.Rev. 134.) Such fictions are not necessary to fix the manufacturer's liability under a warranty if the warranty is severed from the contract of sale between the dealer and the consumer and based on the law of torts (*Decker & Sons* v. *Capps, supra;* Prosser, Torts, p. 689) as a strict liability. (See *Green* v. *General Petroleum Corp.*, 205 Cal. 328 [270 P. 952, 60 A.L.R. 475]; *McGrath* v. *Basich Bros. Const. Co.*, 7 Cal.App.2d 573 [46 P.2d 981]; Prosser, *Nuisance Without Fault*, 20 Tex.L. Rev., 399, 403; Feezer, *Capacity To Bear The Loss As A Factor In The Decision Of Certain Types of Tort Cases*, 78 U. of Pa.L.Rev. 805, 79 U. of Pa.L.Rev. 742; Carpenter, *The Doctrine of Green* v. *General Petroleum Corp.*, 5 So.Cal.L.Rev. 271; Pound, *The End of Law As Developed In Legal Rules And Doctrines*, 27 Harv.L.Rev. 195, 233.) Warranties are not necessarily rights arising under a contract. An action on a warranty "was, in its origin, a pure action of tort," and only late in the historical development of warranties was an action in assumpsit allowed. (Ames, *The History of Assumpsit*, 2 Harv.L.Rev. 1, 8; 4 Williston on Contracts (1936) § 970.) "And it is still generally possible where a distinction of procedure is observed between actions of tort and of contract to frame the declaration for breach of warranty in tort." (Williston, loc. cit.; see Prosser, *Warranty On Merchantable Quality*, 27 Minn.L.Rev. 117, 118.) On the basis of the tort character of an action on a warranty, recovery has been allowed for wrongful death as it could not be in an action for breach of contract. (*Greco* v. *S. S. Kresge Co.*, 277 N.Y. 26 [12 N.E.2d 577, 115 A.L.R. 1020]; see *Schlick* v. *New York Dugan Bros.*, 175 Misc. 182 [22 N.Y.S.2d 238]; Prosser, op. cit., p. 119.) As the court said in *Greco* v. *S. S. Kresge Co., supra,* "Though the action may be brought solely for the breach of the implied warranty, the breach is a wrongful act, a default, and, in its essential nature, a tort." Even a seller's express warranty can arise from a noncontractual affirmation inducing a person to purchase the goods. (*Chamberlain Co.* v. *Allis-Chalmers etc. Co.*, 51 Cal.App.2d 520 [125 P.2d 113].) "As an actual agreement to contract is not essential, the obli-

gation of a seller in such a case is one imposed by law as distinguished from one voluntarily assumed. It may be called an obligation either on a quasi-contract or quasi-tort, because remedies appropriate to contract and also to tort are applicable." (1 Williston on Sales, 2d ed. § 197; see Ballantine, *Classification of Obligations,* 15 Ill.L.Rev. 310, 325.)

As handicrafts have been replaced by mass production with its great markets and transportation facilities, the close relationship between the producer and consumer of a product has been altered. Manufacturing processes, frequently valuable secrets, are ordinarily either inaccessible to or beyond the ken of the general public. The consumer no longer has means or skill enough to investigate for himself the soundness of a product, even when it is not contained in a sealed package, and his erstwhile vigilance has been lulled by the steady efforts of manufacturers to build up confidence by advertising and marketing devices such as trade-marks. (See *Thomas* v. *Winchester,* 6 N.Y. 397 [57 Am.Dec. 455]; *Baxter* v. *Ford Motor Co.,* 168 Wash. 456 [12 P.2d 409, 15 P.2d 1118, 88 A.L.R. 521]; *Crist* v. *Art Metal Works,* 230 App.Div. 114 [243 N.Y.S. 496], affirmed 255 N.Y. 624 [175 N.E. 341]; see also Handler, *False and Misleading Advertising,* 39 Yale L.J. 22; Rogers, Good Will, Trade-Marks and Unfair Trading (1914) ch. VI, A Study of The Consumer, p. 65 et seq.; Williston, *Liability For Honest Misrepresentations As Deceit, Negligence Or Warranty,* 42 Harv.L.Rev. 733; 18 Cornell L.Q. 445.) Consumers no longer approach products warily but accept them on faith, relying on the reputation of the manufacturer or the trade mark. (See *Max Factor & Co.* v. *Kunsman,* 5 Cal.2d 446, 463 [55 P.2d 177]; *Old Dearborn etc. Co.* v. *Seagram-Distillers Corp.,* 299 U.S. 183 [57 S.Ct. 139, 81 L.Ed. 109, 106 A.L.R. 1476]; Schechter, *The Rational Basis of Trade Mark Protection,* 40 Harv.L.Rev. 813, 818.) Manufacturers have sought to justify that faith by increasingly high standards of inspection and a readiness to make good on defective products by way of replacements and refunds. (See Bogert and Fink, *Business Practices Regarding Warranties In The Sale Of Goods,* 25 Ill.L.Rev. 400.) The manufacturer's obligation to the consumer must keep pace with the changing relationship between them; it cannot be escaped because the marketing of a product has become so complicated as to require one or more

468

intermediaries. Certainly there is greater reason to impose liability on the manufacturer than on the retailer who is but a conduit of a product that he is not himself able to test. (See Soule, Consumer Protection, 4 Encyclopedia of The Social Sciences, 282; Feezer, *Manufacturer's Liability For Injuries Caused By His Products: Defective Automobiles*, 37 Mich.L. Rev. 1; Llewellyn, Cases And Materials on Sales, 340 et seq.)

The manufacturer's liability should, of course, be defined in terms of the safety of the product in normal and proper use, and should not extend to injuries that cannot be traced to the product as it reached the market.

Appellant's petition for a rehearing was denied August 3, 1944. Edmonds, J., voted for a rehearing.