

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-17-2007

# Luciana v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 05-3544

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Luciana v. Atty Gen USA" (2007). *2007 Decisions.* Paper 338.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/338

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-3544
_____


WANDAYANI LUCIANA,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent


_____

Petition for Review of an Order of the
Board of Immigration Appeals
(No. A95-862-243)
Immigration Judge: Charles M. Honeyman
_____


Submitted pursuant to Third Circuit LAR 34.1(a)
February 27, 2007

Before: McKee and Aldisert, *Circuit Judges*, and Restani,

*Judge*[*]

(Filed September 17, 2007)


Lisa A. Baird
924 Cherry Street, Ste. 519
Philadelphia, PA 19107

      Attorney for Petitioner

Peter D. Keisler
      Assistant Attorney General
      Civil Division
Richard M. Evans
Mark L. Gross
Wonkee Moon
Department of Justice
950 Pennsylvania Ave., NW
PHB Room 4503
Washington, DC 20530

      Attorneys for Respondent

---

[*] The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

2

––––––––––

OPINION OF THE COURT

––––––––––

ALDISERT, *Circuit Judge*.

This petition by Wandayani Luciana for review of an order of the Board of Immigration Appeals ("BIA" or "Board") requires us to decide whether a single fabricated incident in Petitioner's time-barred asylum application renders the application frivolous and consequently renders her permanently ineligible for any and all benefits under the Immigration and Nationality Act. We conclude as a matter of law that Petitioner's petition was not frivolous, and we will grant this petition for review.

I.

Luciana is an Indonesian national of Chinese ancestry. She entered the United States as a nonimmigrant visitor on or about December 7, 2000, with authorization to remain here until June 6, 2001. She remained past that date and submitted an application for asylum and withholding of removal on November 2, 2002, approximately 23 months after her arrival in the United States. In her application, she asserted that she is ethnically Chinese and Christian, and alleged past persecution as well as a well-founded fear of future persecution based on her race and religion should she return to Indonesia.

3

The Asylum Officer denied her application, and referred her case to the immigration enforcement authorities. Luciana was served with a Notice to Appear charging that she was removable from the United States because, after admission as a nonimmigrant under the Immigration and Nationality Act ("INA") § 101(a)(15), 8 U.S.C. § 1101(a)(15), she remained in the United States longer than permitted. She appeared before an immigration judge ("IJ") and conceded removability, but requested asylum, withholding of removal, relief under Article III of the Convention Against Torture ("CAT"), and, in the alternative, voluntary departure.

A hearing was held before the IJ on December 23, 2003. Luciana testified through an Indonesian interpreter that she is an Indonesian national of Chinese ancestry and that she entered the United States on December 10, 2000. She testified that, in Indonesia, she was a baptized member of the Pentecostal Christian Church from February 26, 1995, until her departure to the United States in December 2000. She testified that since her arrival here she has been a member of a number of Indonesian Christian churches.

She explained that, when living in Indonesia, she experienced problems because of her Chinese ancestry and religious beliefs. First, she testified about an incident in which she was dismissed from school "because there was an incident where a maid was beaten by her pastor who was Chinese." A.R. 194. She also testified that she was often mocked on the streets

4

on her way to and from school because she was Chinese. She further recounted two incidents in 1998 during which groups of men looted her father's store while she was away. Her father reported one of the incidents to the police, but they told him they could not help. Lastly, Luciana testified that, because of riots targeting Christians of Chinese ancestry, her church in Indonesia was forced to meet in members' homes.

Luciana wanted to leave Indonesia because she was afraid. She said that people of Chinese descent were not protected in Indonesia, and that her life would be in danger if she returned to Indonesia because Muslims, who are the majority in Indonesia, hate Christians. She also testified that she believed that if she returned to Indonesia and opened a business, she would likely be robbed.

When the IJ asked why she did not apply for asylum during her first year in the United States, she said that she planned to file an asylum application in May 2001, but her father suffered an accident and she was forced to take care of him.[1] When the IJ asked her why her father's injury prevented her from filing her application, she testified that, as the oldest

---

[1]Apparently, Luciana came to the United States with her father, See Ek Go, and her mother, Widyani Suwita. Her mother and father also filed asylum applications and, at one time, the applications of all three were consolidated. However, Luciana's was later severed from her parents' asylum applications. Luciana also had a minor brother who was in the country legally under a student visa.

child, she was responsible for caring for her father and seeing to his medical needs. She testified that her father's accident occurred in May 2001, he had related surgeries through June 2001, and he underwent out-patient physical therapy until December 2001. The IJ noted that Luciana did not apply for asylum until November 2002 – 11 months after the end of her father's physical therapy. When government counsel asked why she could not file the application while caring for her father given that she knew the application needed to be filed within one year, Luciana explained that she "was not thinking that far ahead and continued to care for her father who was under stress." App. 20.

Luciana testified that she asked an attorney to help her in filing an asylum application, but that he refused to help after learning that she had been in the United States for longer than one year. Subsequently, she got help from a man named "Tony Tju" who prepared the application for her. She gave him written information about her experiences in Indonesia for use in preparing the asylum application. When the IJ asked if the information in her asylum application was consistent with the information she provided to Tju, Luciana testified that she did not provide Tju with information about the December 1999 incident that was included in her asylum application. In her asylum application, Luciana alleged that she had been assaulted and cut with a knife by native Indonesians because of her religious beliefs on the way to church. Luciana testified that Tju made up the incident because he believed it would strengthen

her application. She testified that she attended her asylum interview with Tju but without an interpreter. She further testified that although she did not affirmatively discuss the made-up December 1999 incident and knew that it did not occur, when the asylum officer asked her about it, she described the incident as written in her application. Luciana testified that she lied about this incident because Tju told her that if she told the truth about it, he would tell the asylum officer that the lie was entirely hers and that he had nothing to do with it. She said that because she was not very familiar with the asylum process, she was fearful.

The IJ issued an oral decision in which he found that Luciana was statutorily ineligible for asylum because she failed to file an asylum application within the one-year limitation period without demonstrating exceptional circumstances or changed country conditions to excuse the delay. Additionally, the IJ stated that if one of the exceptions to the one-year bar were to apply, he "would also have serious problems with regard to the respondent's claim . . . ." App. 25. Although the IJ found her assertions that she is a Christian and a native of Indonesia credible, he stated that, were he to reach the merits of the asylum application, he would find her testimony not credible insofar as it pertained to past persecution. The IJ then considered Luciana's requests for withholding of removal and relief under the CAT. He found that she presented no evidence of past persecution. In addition, he concluded that she had not demonstrated that it was more likely than not that she would be

7

persecuted or tortured because of her race or religion by, or with the consent or acquiescence of any agent of, the Indonesian government. Therefore, the IJ denied Luciana's application for asylum, withholding of removal, relief under the CAT, and, in the alternative, voluntary departure.[2] In addition, because of the fabrication of the December 1999 incident, the IJ found that Luciana "knowingly filed an asylum application which is frivolous in part, thereby triggering the lifetime bar to benefits pursuant to Section 208(d)(6) and 8 C.F.R. § 208.20 *et seq*." App. 32-33.

Luciana filed a Notice of Appeal to the BIA on January

---

[2] Because the IJ found that Luciana was not a person of good moral character, he denied Luciana's request for voluntary departure. *See* 8 U.S.C. § 1229c(b)(1)(B). His finding that she was not a person of good moral character was based on his finding that she ratified the partially-fabricated asylum application during her interview with the asylum officer. INA § 101(f)(6) provides, in relevant part: "No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established is, or was – . . . one who has given false testimony for the purpose of obtaining any benefits under this chapter." 8 U.S.C. § 1101(f)(6). In *In re R-S-J*, 22 I.&N. Dec. 863, Interim Dec. (BIA 1999), the BIA held that for purposes of INA § 101(f)(6), false oral statements made under oath to an asylum officer can constitute false testimony as defined in *Phinpathya v. INS*, 673 F.2d 1013 (9th Cir. 1981), *reversed on other grounds*, 464 U.S. 183 (1984).

14, 2004. On August 7, 2004, Luciana married a United States citizen, William T. Hughes, Jr. Thereafter, on February 2, 2005, the Department of Homeland Security approved the Petition for Alien Relative (Form I-130) that Hughes filed for Luciana, and authorized Luciana to apply to adjust her status to permanent resident (Form I-485). Luciana and Hughes testifed that their son, Evan, was born on June 14, 2005. On March 17, 2005, Luciana filed a motion with the BIA to overturn the IJ's frivolousness finding and remand her case to the IJ for consideration of her application to adjust status to lawful permanent resident.

On June 24, 2005, the BIA affirmed the IJ's decision "based upon and for the reasons set forth therein." App. 3. The BIA agreed that Luciana did not file her asylum application in a timely fashion or demonstrate circumstances preventing her from filing for asylum within the allotted time. The BIA also agreed that she did not establish that it is more likely than not that she would be persecuted or tortured if returned to Indonesia, and it affirmed the IJ's "finding that [Luciana] filed a frivolous asylum application." *Id.* The BIA also held Luciana ineligible for adjustment of status because her asylum application had been found frivolous. Therefore, it denied her motion for remand to the IJ for an adjustment of status.

Luciana then filed a timely petition for review.

II.

9

A.

We begin by reviewing the relevant provisions of asylum law. Under 8 U.S.C. § 1158(a)(1), "[a]ny alien who is physically present in the United States . . . may apply for asylum . . . ." This provision, however, "shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." *Id.* § 1158(a)(2)(B). Therefore, an alien who fails to satisfy the one-year timeliness requirement lacks "[a]uthority to apply for asylum." *Id.* § 1158(a). Two narrow exceptions exist, however:

> An application for asylum of an alien may be considered, notwithstanding subparagrap[h] (B) . . . , if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified in subparagraph (B).

*Id.* § 1158(a)(2)(D).

Asylum law also provides severe consequences for filing a frivolous asylum application. Section 1158 provides in relevant part:

10

(d) Asylum Procedure

(4) Notice of privilege of counsel and consequences of frivolous application

At the time of filing an application for asylum, the Attorney General shall –

(A) advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum . . .

(6) Frivolous applications

If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this chapter, effective as of the date of a final determination on such application.

*Id.* § 1158(d).

In recognition of "the severe consequences of a finding of frivolousness under 8 U.S.C. § 1158(d)(6), the corresponding federal regulations prescribe the parameters within which the IJ

11

and the BIA must operate in making these determinations." *Liu v. U.S. Dept. of Justice*, 455 F.3d 106, 112 (2d Cir. 2006) (Calabresi, J.). Specifically, the regulations state:

> For applications filed on or after April 1, 1997, an applicant is subject to the provisions of section 208(d)(6) of the Act only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien knowingly filed a frivolous asylum application. For purposes of this section, an asylum application is frivolous if any of its material elements is deliberately fabricated. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim . . . .

8 C.F.R. § 208.20.

We interpreted this regulation in *Muhanna v. Gonzales*, 399 F.3d 582 (3d Cir. 2005), and emphasized the distinction between a finding of frivolousness and a finding of not credible. We stated that "a finding of frivolousness does not flow automatically from an adverse credibility determination in any event." *Id.* at 589. The finding of "[i]nconsistencies between testimony and an asylum application" does not "equate to a

12

frivolousness finding under Section 1158(d)(6)." *Id.* In *Muhanna*, we held that, "by imposing a frivolousness finding based not on a thorough examination of the application but instead on [the IJ's] assessment of [the petitioner's] credibility, and by consequently refusing to allow further testimony, the IJ violated [the petitioner's] rights and deprived [her] of due process." *Id.*

B.

It is worth pausing to emphasize the importance of the frivolousness standard. Its importance stems not just from the frequency with which it potentially could arise, *see Liu*, 455 F.3d at 117, but also from the severity of the consequences accompanying a finding of frivolousness. To put it bluntly, a frivolousness finding is a "death sentence" for an asylum-seeker's hopes of securing permanent, legal residence in the United States. *Muhanna*, 399 F.3d at 588. It renders an asylum applicant "permanently ineligible for any benefits" under the immigration laws. 8 U.S.C. § 1158(d)(6). This bar is "[o]ne of the 'most extreme provisions' in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996," and, once imposed, it "'may not be waived under any circumstances.'" *Muhanna*, 399 F.3d at 588 (quoting Austin T. Fragomen, Jr., et al., *Immigration Legislation Handbook* § 8:96 (database updated

13

April 2004)).[3]

In the case at bar, the consequences are particularly tangible because Petitioner has now married a U.S. citizen, with whom she has a child. Were it not for the frivolousness finding, Luciana could apply for a Waiver of Grounds of Inadmissibility (Form I-601). *See United States v. Tinoco-Medina*, 6 OCAHO 890, 1996 WL 670175, *19 (1996) (commenting, in a case where a non-citizen had committed document fraud and had been convicted of spousal abuse but had submitted an I-601 waiver request, that "[s]ince his wife is a naturalized citizen, respondent may adjust his status").

III.

In the case at bar, Petitioner does not contest the denial of her asylum application on timeliness grounds, or the IJ's or BIA's refusals to grant her withholding of removal or protection under the CAT. She disputes only the finding that her asylum application was frivolous.

We review *de novo* the BIA's and IJ's applications of the

---

[3] The permanent bar imposed by 8 U.S.C. § 1158(d)(6) applies only to discretionary forms of relief and not, therefore, to withholding of removal or to relief under the Convention Against Torture. *See* 8 C.F.R. § 208.20; *Muhanna*, 399 F.3d at 589.

legal standard of frivolousness. *See Wang v. Ashcroft*, 368 F.3d 347, 349 (3d Cir. 2004). Because the BIA affirmed and adopted the IJ's opinion, we review the decisions of both the BIA and the IJ. *See Jarbough v. Attorney General*, 483 F.3d 184, 191 (3d Cir. 2007).[4]

The IJ established that Petitioner did not file her application within one year of arrival – a finding she does not contest – and found no exception applicable.[5] The IJ did not,

---

[4] We have jurisdiction to review the IJ's and BIA's determinations under 8 U.S.C. § 1252 because the IJ's frivolousness determination was reviewed by the BIA and Petitioner raises it on appeal. *See* Petitioner's Br. at 2, 8. Furthermore, as to materiality – the specific sub-issue of frivolousness on which we determine the case turns – we agree with the government that "[P]etitioner appears to contend that the IJ improperly based its 'frivolousness finding' on its adverse credibility determination, and did not specifically find that [P]etitioner's fabricated incident was material to her asylum application . . . ." Respondent's Br. at 20.

[5] Although Petitioner testified that she had been busy caring for her injured father during her first year in the United States, and that her parents needed her assistance due to their limited knowledge of English, the IJ stated that he was "at a loss to understand why a simple form could not have been prepared, even in a skeletal fashion and filed with the then INS, even if [Petitioner] did not have all the supporting documents." App. 24. Petitioner does not contest the IJ's finding that neither

however, end his analysis there. He proceeded to examine the substance of the application and determined that Petitioner's application was frivolous. He stated: "if a review of this record would determine that the exception to the one-year filing bar should be invoked, the Court would also have serious problems with regard to [Petitioner's] claim, . . . [*inter alia*] because of the actions that [Petitioner] took in ratifying the fabricated/material additions to her application for asylum at the Asylum Office interview." App. 25-26. He went on to consider whether Petitioner's asylum application was frivolous, weaving together his discussion of frivolousness with his discussion of credibility.

The IJ focused on the inclusion in Petitioner's asylum application of a false statement that she had been stabbed because of her religious beliefs – the statement that Petitioner testified was added by Tony Tju, who prepared her application.[6]

___

exception applies.

[6] The IJ stated:

While [Petitioner] indicates that the application was prepared by Mr. Tju after he received her written story, she does not indicate that she did not know that the story contained an additional factual element that was false, in fact, a factual element which would reflect the only incident in which [Petitioner] was physically harmed in Indonesia allegedly on the basis of a protected

He concluded that, were the merits of the asylum application at issue, he "would enter a mixed credibility finding in this case . . . ." App. 28. As to frivolousness, however, the IJ did not couch his views in hypothetical language, instead determining that Petitioner "is permanently ineligible for any benefits under the [Immigration and Nationality] Act," app. 30, and ordering "that [Petitioner] be deemed an individual who has knowingly filed an application for asylum which is frivolous in part," app. 33. He concluded that "[t]here is absolutely no way that this Court can in any way absolve [Petitioner] from such a frivolous[ness] finding." App. 28.

The IJ's frivolousness finding was based on an error of

---

> ground. [Petitioner's] actions suggest that, even if the original idea to add the additional fact pattern was Mr. Tju's, that participating in the signing of the application and, more importantly, ratifying the false component of that application at the Asylum Officer interview leads the Court to conclude that [Petitioner] knowingly participated with Mr. Tju in a conspiracy to submit an application that was at least in part false in a material respect.

App. 26-27. The IJ went on to comment that Petitioner "indicate[d] that she is a serious Christian, but, nevertheless, apparently had no problems in submitting a false statement." App. 27.

law. Although we believe there are many other ways in which the frivolousness finding in this case rests on unsure footing, we make our determination on a single, simple basis: Petitioner's false statement was not material. *See* 8 C.F.R. § 208.20 ("[A]n asylum application is frivolous if any of its *material* elements is deliberately fabricated . . . ." (emphasis added)).

Neither the relevant statute nor the regulations define material, and the caselaw on frivolousness does not provide a definition. The Supreme Court, however, has conclusively settled the meaning of the term. In *Kungys v. United States*, 485 U.S. 759, 769-772 (1988), the Supreme Court discussed the meaning of "material" at some length. In *Kungys*, which arose in the context of an action to revoke citizenship, the Court considered "whether certain misrepresentations or concealments made by Kungys in connection with his naturalization proceeding were material." *Id.* at 763. The Supreme Court reviewed dictionary definitions and historical uses of the term, and endorsed the following definition: "[A] concealment or misrepresentation is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id.* at 770 (internal quotation marks omitted); *see also United States v. Wells*, 519 U.S. 482, 489 (1997) (same).

In the case at bar, the falsehood had neither the natural tendency nor the capability of influencing the decision of either

18

the Asylum Officer, the IJ or the BIA.[7] Because Petitioner's asylum application was untimely, she could not be granted asylum unless her case fell under an exception to the time limit. *See* 8 U.S.C. §§ 1158(a)(2)(B), (a)(1). Once it became clear that no exception applied, her application had to be rejected as time-barred. Evidence going to the merits of the application – such as Petitioner's story about the stabbing – was of no consequence, no matter how persuasive or compelling it might have been. Such evidence was totally incapable of influencing the decision-makers, and therefore it was not material. From all this there is but one logical conclusion: because Petitioner's statement was not material, it was an error of law to conclude that her application was frivolous.

Because we determine that the falsehood on which the IJ based his frivolousness finding was not material, and therefore the finding was erroneous as a matter of law, we need not consider whether 8 U.S.C. § 1158 provides authority to issue a frivolousness finding in the context of an untimely asylum application. We note, however, that the existence of such authority is far from clear. An individual lacks "[a]uthority to apply for asylum" if her application is untimely and no exception to the one-year bar applies. 8 U.S.C. § 1158(a). If an individual lacks authority to apply for asylum, any application for asylum would seem to be a nullity, preventing the IJ from

---

[7] It is not necessary to determine which of Petitioner's statements indeed was false – her initial story or her recantation.

19

reaching the merits of the asylum application and assessing whether "any of its material elements is deliberately fabricated." 8 C.F.R. § 208.20.[8]

IV.

A.

A recent BIA decision and associated opinions of the Court of Appeals for the Second Circuit raise additional questions about the propriety of the IJ's frivolousness finding in the case before us that deserve some comment here. In *Liu*, 455 F.3d at 106, our sister Court of Appeals considered a frivolousness finding. Stating that it found itself confronted by issues with which it dealt infrequently and "on which the BIA has, thus far, provided no substantial guidance," *id.* at 110, the court remanded the case "to give the BIA an opportunity, in the first instance, to formulate standards for deciding when an asylum seeker's application may be deemed frivolous," *id.* at 108.

On remand, the BIA reversed its prior decision, vacating

---

[8] Additionally, in the case of an untimely application, 8 U.S.C. § 1158(a)(2)(D) states that the application "may be considered" if one of the stated exceptions applies. This language may fairly imply that an application may *not* be considered if an exception does not apply.

the IJ's frivolousness finding. *See In re Y-L-*, 24 I. & N. Dec. 151 (BIA 2007). In so doing, the Board stated that "the following requirements" must be met in reaching a frivolousness finding:

> (1) notice to the alien of the consequences of filing a frivolous application; (2) a specific finding by the Immigration Judge or the Board that the alien knowingly filed a frivolous application; (3) sufficient evidence in the record to support the finding that a material element of the asylum application was deliberately fabricated; and (4) an indication that the alien has been afforded sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

*Id.* at 155.

The BIA elaborated on each of these four procedural safeguards. As to the notice requirement, the BIA stated that 8 U.S.C. § 1158(d) and 8 C.F.R. § 208.20 "require that the Attorney General advise the alien at the time of filing an asylum application of the consequences of filing a frivolous application, i.e., permanent ineligibility for any benefits under the Immigration and Nationality Act except for withholding of removal." *Id.* The BIA noted that the asylum application form, I-589, contains a standard warning that "'[a]pplicants

21

determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act'"; the BIA did not, however, state "whether this notice alone would suffice under the notice requirement." *Yang v. Gonzales*, --- F.3d ---, 2007 WL 2177116, *7 n.3 (2d Cir. 2007) (quoting *Y-L-*, 24 I. & N. Dec. at 155).

As to the second safeguard, the BIA stated that "the Immigration Judge must separately address the question of frivolousness, including a discussion of the evidence supporting a finding that the respondent deliberately fabricated a material element of the asylum claim." *Y-L-*, 24 I. & N. Dec. at 156.[9] In *Y-L-*, the IJ included two paragraphs finding that the asylum applicant had deliberately fabricated an account of an abortion and illegal adoption, and addressed the materiality of the fabrications. *Id.* at 157.

With regard to the third safeguard – requiring "sufficient evidence in the record to support the finding that a material element of the asylum application was deliberately fabricated," *id.* at 155 – the BIA stated:

After taking into account the respondent's explanations

---

[9] Later in the opinion, the BIA noted that the regulation mandates "specific findings of deliberate fabrication of a material element of the asylum application . . . " *Y-L-*, 24 I. & N. Dec. at 158.

for discrepancies or implausible aspects of the claim, ... the Immigration Judge must provide *cogent and convincing reasons for finding by a preponderance of the evidence* that an asylum applicant knowingly and deliberately fabricated material elements of the claim.

*Id.* at 158 (emphasis added). The Board stated that the regulation "plac[es] the ultimate burden of proof on the Government . . . ." *Id.*

With regard to the fourth safeguard – requiring that an asylum applicant be "afforded sufficient opportunity to account for any discrepancies or implausible aspects of the claim" – the Board stated that "it would be a good practice for an Immigration Judge who believes that an applicant may have submitted a frivolous asylum application to bring this concern to the attention of the applicant *prior* to the conclusion of proceedings." *Id.* at 159-160 (emphasis added). As the Court of Appeals for the Second Circuit has since observed, the BIA, later in the opinion, appears to treat this recommendation as a requirement, at least in some cases. *See Yang*, 2007 WL 2177116 at *5 ("Later in its opinion . . . the BIA appears to *require* such an action in cases where it would not be obvious to an applicant that such a finding was being considered.").[10]

---

[10] In *Y-L-*, the BIA ultimately determined that the IJ had not taken into account the petitioner's explanations for inconsistencies, and so had fallen short of *Y-L-*'s fourth

23

The Court of Appeals for the Second Circuit considered the *Y-L-* standard in *Yang*. *Id.* at *5. The court noted that ambiguities about how to apply the statute and regulations "remain even after *Y-L-*," and chose again "to remand . . . for the BIA to interpret and apply the standards it set forth in *Y-L-* in the first instance." *Id.* at *7. On remand, the court instructed the BIA to consider:

> *inter alia*, the following issues: (1) to what extent the IJ is required to set out his or her factual findings to support a frivolousness determination separately from the adverse credibility determination and to what extent he or she is permitted to incorporate by reference the findings made to support an adverse credibility determination; (2) to what extent the IJ is required to consider the applicant's explanations for any discrepancies separately from the adverse credibility determination; (3) to what extent the IJ is required to explicitly find that the fabrications at issue were "deliberate" or "material"; and (4) to what extent the IJ is required, if at all, to inform the applicant during the course of the proceedings that he or she is considering a frivolousness determination before he or she renders such a determination.

---

requirement. *See Y-L-*, 24 I. & N. Dec. at 162.

*Id.* at *8. The case is currently before the BIA.[11]

### B.

The BIA's decision in *Y-L-* suggests that there may be problems with the IJ's frivolousness finding apart from the error in finding Petitioner's false statement "material." First, it is not apparent that Petitioner received notice "of the consequences of filing a frivolous application" as required by *Y-L-*, 24 I. & N. Dec. at 155. Although Petitioner's application contained a standard warning about frivolousness, the BIA has not stated "whether this notice alone would suffice under the notice requirement." *Yang*, 2007 WL 2177116 at *5 n.3.

---

[11] We are in agreement with the panel in *Yang* that many of the precise contours of frivolousness remain unsettled. Furthermore, we share the panel's hope of obtaining guidance on proper application of the *Y-L-* safeguards from the Board. Nevertheless, we take a different approach in this case. Our decision to forge ahead ourselves rather than remanding to the BIA is influenced by the nature of the issue presented in the case at bar – a relatively narrow issue of law that is for this Court to decide, standing apart from the intricacies of immigration procedure. Additionally, the controlling issue here – the meaning of "material" – is relatively distinct from the questions posed to the BIA in *Yang*, 2007 WL 2177116 at *8, and so we believe our analysis will not interfere with or unduly complicate the resolution of that case.

25

Second, as the Court of Appeals for the Second Circuit has noted, "the BIA appears to *require*" that the IJ bring to an applicant's attention the possibility that her application may be found frivolous "in cases where it would not be obvious to an applicant that such a finding was being considered." *Id.* at *5 (emphasis in original). Were we not resolving this case on materiality grounds, we would want to consider the impact of this potential requirement.

Third, *Y-L-* requires an IJ to make a "specific finding ... that the alien knowingly filed a frivolous application." *Y-L-*, 24 I. & N. Dec. at 155. To satisfy this requirement, "the Immigration Judge must *separately* address the question of frivolousness, including a discussion of the evidence supporting a finding that the respondent deliberately fabricated a material element of the asylum claim." *Id.* at 156 (emphasis added). In the case at bar, the IJ melded together his discussion of credibility and his discussion of frivolousness. Such combined discussion may fall short of the separateness requirement.

We leave these and other questions about frivolousness for future resolution. In the case at bar, Petitioner's false statement lacked the capacity to influence the decision of either the Asylum Officer or the IJ once her asylum application had been found time-barred, and so the statement was not material.

V.

26

Our decision today is driven by the bare force of logic, but we also consider that the outcome here is a just one. Courts are not merely cogs in a system of "mechanical jurisprudence." R. Pound, *Mechanical Jurisprudence*, 8 Colum. L. Rev. 605 (1908). The "jurisprudence of conceptions (*Begriffsjurisprudenz*)" has been superseded "by a jurisprudence of results (*Wirklichkeitsjurisprudenz*)." *Id.* at 610; *see* Julius Stone, *Jurisprudence*, 75 Harv. L. Rev. 1240, 1241 (1962).[12]

---

[12] Consider modern-day tort law's rejection of long-standing conceptions of negligence and defamation. In the first opinion advocating what is now known as products liability, a concurring opinion in *Escola v. Coca Cola Bottling Co. of Fresno*, 24 Cal. 2d 453 (1944), Justice Roger Traynor commented: "It is to the public interest to discourage the marketing of products having defects that are a menace to the public. If such products nevertheless find their way into the market it is to the public interest to place the responsibility for whatever injury they may cause upon the manufacturer, who, even if he is not negligent in the manufacture of the product, is responsible for its reaching the market." *Id.* at 462 (Traynor, J., concurring).

Consider, also, the Supreme Court's comments in *New York Times v. Sullivan*, 376 U.S. 254 (1964). Notwithstanding centuries of fealty to conceptual defamation, the Supreme Court produced a sea change in that case. Writing for the Court, Justice William J. Brennan, Jr., said: "[W]e consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement,

When a modern-day court confronts a case, it has been said that "the first question should be, how will a rule or a decision operate in practice?" Pound, *supra*, at 610 (summarizing the approach of Rudolph von Ihering, a pioneer of *Wirklichkeitsjurisprudenz*). We no longer believe that "[o]bviously a principle, if sound, ought to be applied wherever it logically leads, without reference to ulterior results." *Gluck v. City of Baltimore*, 32 A. 515, 517 (1895). Indeed, we now recognize that there are "dangers" in "extend[ing] a maxim or a definition with relentless disregard of consequences to 'a dryly logical extreme.'" *Hynes v. New York Cent. Ry. Co.* 231 N.Y. 229, 235 (1921) (Cardozo, J.).[13] In many cases, "[t]he true grounds of decision are considerations of policy and of social advantage, and it is vain to suppose that solutions can be attained merely by logic and general propositions of law which nobody disputes." *Vegelahn v. Guntner*, 167 Mass. 92, 106 (1896) (Holmes, J., dissenting).

In the case at bar, the IJ found Petitioner to have committed a serious wrong: she ratified a false statement contained in her asylum application. This is a wrong we cannot condone. Immigration proceedings, like almost all legal

---

caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270.

[13] Judge Cardozo wrote this opinion the year he delivered the Storrs Lecture at Yale Law School, which later was published as *The Nature of the Judicial Process* (1921).

28

proceedings, depend on the ability of decision-makers to find the truth. Lies undercut immigration proceedings just as they do proceedings in state and federal courts. Without the truth, the judicial edifice turns to a house of cards.

But Petitioner's misdeed will not go unpunished. Her asylum application has been denied. The IJ's order for her removal – issued, ultimately, because she voluntarily came forward to apply for asylum – stands. Any possibility she has of ever living legally and permanently with her family in the United States now hangs on the willingness of the Attorney General to grant her a waiver. Such waivers are far from a certainty. *See, e.g.*, *Howell v. INS*, 72 F.3d 288 (2d Cir. 1995) (holding that a district court lacked jurisdiction to review the Immigration and Naturalization Service's refusal to grant a waiver of a ground of inadmissibility in the case of a Jamaican woman married to a U.S. citizen).

By additionally issuing a frivolousness finding, the IJ brought down on Petitioner a lifetime ban on all means of legally entering the United States. This punishment falls not only on her, but on her husband and child as well. Because modern jurisprudence recognizes the importance of results, it would seem that the various IJs and the BIA should at least consider the consequences of the draconian penalty attached to a finding that the application for asylum is frivolous, particularly where, as here, the finding may cause the family structure of the applicant to be permanently ruptured.

29

\* \* \* \* \*

Accordingly, because we determine as a matter of law that Petitioner's application for asylum was not frivolous, we grant the petition for review and remand this case to the BIA for further proceedings consistent with this opinion.

30